<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| MARIA I. ANDUJAR, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 04-5002 (FLW) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, | : | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

APPEARANCES:

For Plaintiff:
LORI WINKLER KESSELMAN
Jacobs Schwalbe & Petruzzelli, P.C.
Woodcrest Pavilion
Ten Melrose Avenue, Suite 340
Cherry Hill, NJ 08003

For Defendant:
SHEENA V. BARR
Special Assistant U.S. Attorney
Social Security Administration
Office of General Counsel
26 Federal Plaza, Room3904
New York, NY 10278-0004

<u>**WOLFSON, United States District Judge**</u>

Plaintiff Maria Andujar ("Plaintiff" or "Andujar") appeals from the final decision of Jo

Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying her

disability benefits under the Social Security Act (the "Act").  The Court has jurisdiction to hear

this matter pursuant to 42 U.S.C. § 405(g).

Plaintiff contends that the record, when considered in full, substantiates her claims and requires a conclusion that she was disabled.  Specifically, Plaintiff maintains that the Administrative Law Judge, Daniel W. Shoemaker, Jr. ("ALJ"), erred by (1) failing to properly weigh the medical evidence of record, (2) failing to give the appropriate probative value to the treating physician reports, and (3) failing to properly determine Plaintiff's residual functional capacity ("RFC").  Pl.'s Br. 12-25.  In addition, Plaintiff contends that the Administrative Record ("AR") provides a sufficient basis for an award of summary judgment in her favor.  Id. at 26.  For the reasons stated below, the case is remanded to the Commissioner, for further proceedings consistent with this opinion.

## I.    BACKGROUND

Plaintiff alleges that as a result of her involvement in a motor vehicle accident on November 18, 1997 ("MVA"), she sustained and continues to suffer from back, leg, neck and shoulder pain.  Id. at 74, 92, 291-92.  Prior to her involvement in the MVA, Plaintiff worked as a machine operator and hand packager of greeting cards.  Id. at 75.  Subsequent to her involvement in the MVA, in 1998 Plaintiff worked as a hand packager of light items in a factory.  Id. at 85. Plaintiff claims that she has been disabled since March 9, 1999[1] because of lumbar and depressive disorders.  AR 49, 63-65, 74.

### A.    Procedural History

On March 9, 1999, Plaintiff filed an application for disability insurance benefits under

---

[1]Plaintiff alleges the onset of disability occurred at the time her application for disability benefits was filed on March 9, 1999; however, at the hearing before the ALJ, Plaintiff's counsel admitted that Plaintiff allegedly became disabled on November 18, 1997, the date on which she suffered injury as a result of the MVA.  AR 15, 283.

Title II of the Act.  Id. at 63.  Plaintiff's application was denied initially and again upon reconsideration.  Id. at 15, 37, 45.  Following the denial of her application, Plaintiff requested and received a hearing before an Administrative Law Judge.  At the hearing, which took place on August 8, 2000, Plaintiff was represented by Lori Winkler-Kesselman, Esq.  Id. at 278.  After leaving the record open for the receipt of additional medical evidence, in his June 29, 2001 decision the ALJ determined that Plaintiff was not disabled under the Act.  Id. at 16.  On July 6, 2001, Plaintiff petitioned the Appeals Council for review of the ALJ's decision.  Id. at 11.  The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  Id. at 3.

## B.     Medical Evidence

Plaintiff is forty-seven years old and alleges that she is disabled because of a lumbar disorder sustained as a result of her involvement in the MVA.  Id. 74, 92, 291-92.  Plaintiff also alleges that depressive disorders contribute to her disability.  Id. at 74.  Plaintiff testified that she is about 4'9" tall and weighs approximately 200 pounds.  Id. at 281.  On November 18, 1997, Plaintiff presented at the emergency room of Cooper Hospital complaining of musculo-skeletal pain following her involvement in the MVA in which the side of the vehicle she was driving was struck by another vehicle.  Id. at 219-220.  Following x-rays of the back and pelvis which were negative for fracture, Plaintiff was released.  Id.  Plaintiff returned to Cooper Hospital on November 19, 1997 where she underwent a CT scan.  Id. at 221-22.  The results of the CT scan indicated degenerative changes at the articular facets of L4-L5 and less severely at L5-S1 and no evidence of fracture or malalignment.  Id. at 225.

Following her involvement in the MVA, Plaintiff sought treatment with Dr. Ettore C.

3

Carchia, D.C. at American Spinal Care.  Id. at 227.  On November 25, 1997, Philip Getson, D.O.,

at the request of Dr. Carchia, performed spinal ultrasound studies of Plaintiff's back.  Id. at 248-

50.  The results of the studies revealed mild to moderate inflammation of the lumbar and thoracic

spine; facet joint inflammation at T6, T8, T10, and T11; and mild inflammation of the cervical

spine.  Id.  These findings were consistent with Plaintiff's complaints of pain.  Id.

Also at the request of Dr. Carchia, on December 15, 1997, Erlinda D. Del Rosario, M.D.

examined Plaintiff.  Id. at 233.  Dr. Del Rosario noted that Plaintiff sustained cervical, thoracic

and lumbosacral sprain/strain and posttraumatic headaches as a result of the MVA.  Id. at 234.

Dr. Del Rosario conducted electrodiagnostic tests, the results of which were consistent with her

findings from the examination.  Id. at 236-38.  Dr. Del Rosario issued a referral for physical

therapy treatment at All Pro Rehabilitation.  Id. at 240.

Dr. Badillo of CAMCARE, Plaintiff's general medical care provider, referred Plaintiff to

Pennsauken MRI where she underwent an MRI of her lumbar spine on January 28, 1998.  Id. at

136.  Simon Rothman, D.O. observed a small central disc protrusion at L4-L5 and mild AP

spinal stenosis.  Id.  The following day, Plaintiff underwent an MRI of her cervical spine.  Id. at

135.  In conjunction with this study, Russell S. Golkow, M.D. observed mild to moderate right

paracentral disc herniation at C3-C4 with more pronounced left lateralizing disc herniation at C5-

C6.  Id.

On February 19, 1998, Plaintiff was examined by physiatrist Youssef Wassef, M.D., M.S.

Id. at 241.  In his report to Dr. Carchia, Dr. Wassef indicated that he believed Plaintiff's injuries

were sustained as a result of her involvement in the MVA.  Id. at 243.  Dr. Wassef stated that

Plaintiff's prognosis was "guarded."  Id.

4

Again at the request of Dr. Carchia, on March 3, 1998, Dr. Getson performed additional spinal ultrasound studies of Plaintiff's back.  Id. at 244-46.  The results of the studies indicated mild to moderate inflammation of the sacroiliac joints, lumbar spine, and cervical spine.  Id.  Dr. Getson observed a worsening of L3 and L5 on the right, C3-C7, and the right SI joint, as well as new facet joint inflammation at L3 and L4.  Id. at 245-47.  On the same date, Plaintiff was examined by physical therapist, Martin Ciner, MSPT.  Id. at 251.  All Pro Rehabilitation referred Plaintiff to Mr. Ciner, who observed chronic cervical, thoracic, and lumbosacral strain and sprain with radiculopathy into the right shoulder, right elbow, right wrist, right hip, and right knee.  Id. at 252.  Mr. Ciner reported that Plaintiff had persistent symptoms, was progressing slower than expected, and showed continuing deficiencies in cervical and lumbar spine endurance.  Id.  Mr. Ciner also noted that Plaintiff, at the time of her examination, was not at "maximum medical improvement" and that her functional status would deteriorate without an on-going therapeutic exercise regimen.  Id.

At the request of Plaintiff's counsel, Dr. Carchia prepared a narrative report[2] pertaining to Plaintiff's alleged injuries.[3]  Id. at 227.  Dr. Carchia reported that cervical motion studies revealed a 10%-20% loss in mobility with pain, and lumbar motion studies revealed a 10%-30% loss in mobility with pain.  Id. at 229-30.  Dr. Carchia diagnosed Plaintiff as having inflammation of the arm and neck, sciatica, post traumatic headaches, disc displacement, muscle spasm, and tissue inflammation.  Id. at 230.  He also indicated that Plaintiff suffers from a grade III disc

---

[2]Dr. Carchia's report is undated.

[3]It is unclear from the AR how many times or on which dates Dr. Carchia examined Plaintiff, but there are indications that he referred her to many of the providers she saw as a result of her alleged injuries.

herniation.  Id. at 231.  Dr. Carchia reported that "the patient's symptomology and loss of range of motion point [to] more unfavorable developments in the future."  Id. at 232.  However, he also noted that Plaintiff has had "slow improvement containing progressive general relief of symptoms."  Id. at 231.  Dr. Carchia opined that Plaintiff's pain and limitation of the use of her functions are a direct result of the MVA which have resulted in, and will continue to result in, "substantial and permanent disabilities."  Id. at 232.

On July 6, 2000, Mark J. Reiner, D.O. examined Plaintiff at the request of Dr. Bodea of CAMCARE.  Id. at 263.  Dr. Reiner's examination revealed restricted lumbosacral motion in flexion, extension, side bending, and rotation.  Id.  Dr. Reiner's impression was that Plaintiff had a herniated lumbar disc with sciatica.  Id.  Dr. Reiner recommended a new MRI of Plaintiff's lumbar spine and an EMG of her legs.  Id.  At Dr. Reiner's suggestion, Simon Rothman, D.O. conducted an MRI of Plaintiff's lumbar spine on July 12, 2000.  Id. at 262.  Dr. Rothman observed that Plaintiff suffered from mild AP spinal stenosis secondary to facet hypertrophy.  Id. Mild degenerative arthrodial joint disease was present, but there was no evidence of disc bulge, disc extrusion, free fragments, or encroachment upon the neural canals.  Id.  The study further revealed that the previously observed small central disc protrusion at L4-L5 was no longer visualized.  Id.

In conjunction with her application for supplemental security income ("SSI"), Armando A. Montiel, M.D., of the State of New Jersey Department of Labor, conducted an orthopedic evaluation of Plaintiff on May 21, 1999.  Id. at 164.  At her examination, Plaintiff complained of constant lower back pain that radiates into her legs.  Id.  Despite ordinarily using a cane, Dr. Montiel observed that Plaintiff was able to walk without assistance with no gait instability.  Id. at

6

165.  Dr. Montiel also noted that Plaintiff was able to climb onto the scale and the examination

table without difficulty.  Id.  He observed no evidence of pain and tenderness of Plaintiff's

cervical spine.  Id.  Dr. Montiel's evaluation and palpation of Plaintiff's thoracic and lumbosacral

spine and paramusculature revealed no evidence of pain.  Id. at 165-66.  Plaintiff had a well

preserved range of motion of her cervical spine and full range of motion of her shoulder girdle.

Id. at 165.  Dr. Montiel's impression was that Plaintiff suffered from degenerative joint disease,

lumbosacral strain and sprain, and exogenous obesity.  Id. at 166.  Subsequent to Dr. Montiel's

examination, James H. Jacoby, M.D., F.A.C.R. performed an MRI of Plaintiff's cervical and

lumbar spine.  Id. at 169.  Dr. Jacoby observed mild anterior degenerative changes of the lower

cervical spine and lower lumbar spine.  Id.

The findings of a residual physical function ("RPF") assessment of Plaintiff conducted on

September 10, 1999 were consistent with previous determinations.  Id. at 210.  In addition,

Plaintiff's evaluation indicated that she could lift and carry fifty pounds occasionally or twenty-

five pounds frequently, and had an unlimited ability to push or pull except as to lifting and

carrying.  Id. at 204.  Plaintiff's assessment suggested that she could sit or stand/walk for six

hours of an eight hour work day with normal breaks.  Id.  The RPF evaluation also revealed that

Plaintiff could climb, balance, stoop, kneel, crouch, or crawl on a ramp or stairs frequently and

on a ladder, rope, or scaffolds occasionally.  Id.

## C.   Mental Impairments

In addition, Plaintiff also alleges that depression and her nerves contribute to her disabled

status.  Id. at 74.  On March 4, 1998, Plaintiff presented at New Hopes of New Jersey ("New

Hopes") complaining that she sleeps poorly, is irritable, cannot control herself, has visual

7

hallucinations, has a poor memory, and suffers from headaches.  Id. at 137.  Plaintiff underwent a

psychiatric evaluation conducted by Mohammad M. Bar, M.D. at New Hopes on March 11,

1998.  Id. at 139.  Plaintiff complained that "I can't sleep" and "feel depressed."  Id.  Plaintiff

alleged that she had decreased energy, motivation, and appetite; has had insomnia for two years;

was in a sad mood for most of the day; and experienced crying spells, forgetfulness, feelings of

hopelessness and helplessness, and suicidal feelings.  Id.  Plaintiff also complained that she saw

black shadows.  Id.  Dr. Bar determined that Plaintiff suffers from major depression with

psychotic features.  Id. at 141.  On March 31, 1999, Ronald Rosillo, M.D. of New Hopes

conducted a second psychiatric evaluation of Plaintiff.  Id. at 144.  Dr. Rosillo reported Plaintiff's

current Global Assessment of Functioning ("GAF") score as forty-eight and noted a prior GAF

score of forty-two.  Id.  A GAF score between forty-one and fifty indicates serious symptoms or

any serious impairment in social, occupational or school functioning.  American Psychiatric

Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) [hereinafter

DSM IV].  Plaintiff received treatment for her depression from various providers at New Hopes

from March 4, 1998 until April 28, 1999.  Id. at 137-47.  At her final visit on April 28, 1999, Dr.

Rosillo reported that Plaintiff was "much happier," felt "more animated," had "more initiative,"

was "much less depressed," and was "not as bored any more."  Id. at 147.

On May 1, 1999, Plaintiff underwent a Functional Capacity Assessment ("FCA") and

Psychiatric Review Technique ("PRT").  Id. at 148-160.  During her evaluation, Plaintiff was

alert, well oriented, cooperative, pleasant, and had a good memory.  Id. at 150.  Her ability to

understand, remember, and execute detailed instructions was assessed as being "moderately

limited."  Id. at 148.  Plaintiff's ability to maintain attention and concentration for an extended

8

period of time, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances was also moderately limited.  Id.  In addition, Plaintiff faced moderate limitations on her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a constant pace without an unreasonable number and length of rest periods, and interact appropriately with the general public.  Id. at 149.  Plaintiff was "not significantly limited" in her abilities as to any of the other categories listed on the FCA.  Id. at 148-151.  Plaintiff's assessment indicated a "moderate psychological impairment."  Id. at 150.

Plaintiff's PRT revealed that she suffered from a depressive syndrome characterized by anhedonia; difficulty concentrating or thinking; thoughts of suicide; and hallucinations, delusions, or paranoid thinking.  Id. at 155.  Plaintiff's condition amounted to a moderate restriction of her daily living activities and slight difficulties in maintaining social function.  Id. at 159.  As a result of her depression, Plaintiff's evaluation revealed that she would often fail to complete tasks in a timely manner as a result of deficiencies in concentration, persistence, or pace.  Id.  On September 19, 1999, Dr. M.A. D'Anton affirmed both the FCA and PRT.  Id. at 148, 152.

On May 13, 1999, Young B. Lee, M.D., of the New Jersey Department of Labor, conducted a psychiatric evaluation of Plaintiff.  Id. at 161.  Dr. Lee's examination revealed a mild psychiatric impairment with no objective signs of depression or hallucinations.  Id. at 163. Plaintiff was able to follow directions and her speech and attitude were spontaneous, but her interpersonal relationships were limited.  Id.

Plaintiff next underwent a psychiatric evaluation on July 8, 2000 at Nueva Vida

Behavioral Health Center.  Id. at 254.  Dr. Pirooz Sholevar, Plaintiff's treating psychiatrist, observed that Plaintiff suffered from depression, insomnia, anxiety, and occasional suicidal thoughts.  Id.  Dr. Sholevar assessed Plaintiff's prognosis as fair with a current and past year GAF score of fifty-five.  Id. at 255.  A GAF score of fifty-five indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.   American Psychiatric Ass'n, DSM IV, 34.  On August 1, 2000, Dr. Sholevar completed[4] a mental assessment form and residual function capacity questionnaire as to Plaintiff's condition.  AR 256-60.  Regarding Plaintiff's ability to function in the workplace, Dr. Sholevar found that Plaintiff had a fair[5] ability to follow work rules, relate to co-workers, deal with the public, and maintain attention and concentration.  Id. at 256, 259.  Plaintiff also retained a poor/fair ability to follow simple job instructions, but no ability to follow complex or detailed instructions.  Id. at 256, 259-60.  Plaintiff's ability to use judgment with the public, interact with supervisors, deal with work stresses, and function independently was assessed as poor/none.[6]  Id.  Dr. Sholevar also noted that Plaintiff was "very distracted."  Id. at 259.  An assessment of Plaintiffs ability as to social function revealed that Plaintiff had a fair ability to maintain her appearance, follow simple job instructions, and demonstrate reliability, but her ability to behave in an emotionally stable manner was assessed as poor or none.  Id. at 260.  Dr. Sholevar also indicated that Plaintiff

---

[4]Dr. Sholevar did not answer all questions contained on the residual function capacity questionnaire.  AR 257.

[5]Fair is defined on the Mental Assessment Form as "ability to function in this area is seriously limited, but not precluded."  Id. at 256.

[6]Poor or None is defined on the Mental Assessment Form as "no useful ability to function in this area."  Id.

"doesn't follow any instruction." Id.  Furthermore, an analysis of Plaintiff's residual functional capacity ("RFC") revealed that Plaintiff had a moderately severe[7] psychiatric impairment in her ability to relate to other people, degree of restriction in daily activities, degree of deterioration in personal habits, and ability to comprehend and follow instructions. Id. at 257-58.  Plaintiff's RFC assessment also revealed that she had a severe[8] psychiatric impairment in the constriction of her interests as well as in her ability to perform work requiring frequent or minimal contact with others. Id.

On April 17, 2001, Plaintiff was reevaluated by Dr. Lee of the New Jersey Department of Labor. Id. at 267.  Dr. Lee's findings were consistent with his earlier report. Id. at 267-71.  Dr. Lee's evaluation revealed no gross or particular signs of depression, despite Plaintiff appearing moderately depressed. Id. at 269.  Dr. Lee also indicated that Plaintiff's ability to understand, remember, and carry out instructions was impaired by her depression, as was her ability to respond appropriately to supervision, co-workers, and pressures in a work setting. Id. at 270-71.

## II.   DISCUSSION

### A.   Standard of Review

The Commissioner's decisions as to questions of fact are conclusive upon a reviewing court if supported by "substantial evidence in the record."  42 U.S.C. § 405(g); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence has been defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate.'"

---

[7]Moderately severe is defined on the Mental Assessment Form as an impairment which seriously affects ability to function. Id.

[8]Severe is defined on the Mental Assessment Form as extreme impairment of ability to function.  AR 256.

Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). The substantial evidence standard is a deferential standard of review. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (citing Schaudeck v. Comm'r of Soc. Sec. Admin., 191 F.3d 429, 431 (3d Cir. 1999)). The district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

### B.      Standard for Entitlement of Benefits

In order to establish a disability under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); see also Plummer, 186 F.3d at 427.  An individual is not under a disability unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has promulgated regulations setting forth a five-step evaluation process for determining whether a claimant is disabled.  20 C.F.R. § 404.1520; see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Plummer, 186 F.3d at 428.  In step one, the Commissioner must first determine whether the claimant has shown he is not currently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a).  If a claimant is found to be engaged in substantial gainful activity, the claim will be denied.  Bowen, 482 U.S. at 140.

12

Where the claimant is not performing substantial gainful work, the Commissioner proceeds to step two to determine whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his or her physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c); see also Bowen, 482 U.S. at 140-41.  If a claimant fails to show that the impairments are severe, he or she is ineligible for disability benefits.  Bowen, 482 U.S. at 141; Plummer, 186 F.3d at 428.

In step three, if the claimant is not performing substantial gainful work and has a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or medically equals a listed impairment contained in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listings of Impairments"), the claimant has satisfied his burden of proof, is presumed disabled, and is entitled to benefits. See 20 C.F.R. § 404.1520(d); Bowen, 482 U.S. at 141.

If the Commissioner determines that the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the ALJ must consider at step four whether the claimant retains the residual functional capacity to perform his or her past relevant work.  20 C.F.R. § 404.1520(d); Bowen, 482 U.S. at 141; Plummer, 186 F.3d at 428.  If the claimant is able to perform his or her previous work, the claimant is determined not to be disabled.  20 C.F.R. §§ 404.1520(e), 416.920(e); Bowen, 482 U.S. at 141-42.  The claimant bears the burden of demonstrating an inability to return to the past relevant work.  Plummer, 186 F.3d at 428.

Finally, if it is determined that the claimant is no longer able to perform his previous work, the burden of production then shifts to the Commissioner to show, at step five, that the

claimant is capable of performing other available work in order to deny a claim of disability.  20 C.F.R. § 404.1520(f); Plummer, 186 F.3d at 428.  The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with the claimant's medical impairments, age, education, past work experience, and residual functional capacity.  Id.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and is not disabled.  Id.

### C.    Decision and findings of the ALJ

The ALJ determined that Plaintiff was not disabled at any time from November 18, 1997, the alleged date of onset of her disability, through June 29, 2001, the date of the ALJ's decision. Id. at 16.  For the period between November 18, 1997 and June 29, 2001, the ALJ determined that Plaintiff did not establish step three of the five-step sequential evaluation to establish disability because her impairments did not equal or meet those within the Impairment List.  Id. The ALJ also concluded that Plaintiff was able to perform her past relevant work and other work existing in the national economy.  Id. at 22.  After considering the entire record, the ALJ made the following findings:

1.    The claimant's earnings record, as maintained by the Administration reveals income or posted earnings after the claimant's alleged onset of disability, in calendar year 1998.  At the hearing, the claimant testified that she worked in 1998 as a packer.

2.    The claimant has the following impairments, which are considered "severe" under the Social Security Act and Regulations: a depressive disorder, obesity, degenerative joint disease and lumbosacral strain and sprain (20 CFR 416.921).

3.    Although the claimant does have medically determinable "severe" impairments, they do not meet or equal one of the listed impairments in the Commissioner's Listing of Impairments located in 20 FR Part

14

404, Appendix 1, Subpart P, Regulation No. 4, giving particular consideration to Medical Listings 1.00F, 1.05(c) and 12.04.

4. The undersigned finds the claimant's allegations regarding her limitations are generally credible, however not [to] the extent that would render her totally disabled, for the reasons set forth in the body of the decision.

5. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments, and has found that the reports of her treating and examining physicians provide persuasive evidence that the claimant is not disabled (20 CFR 416.927).

6. The claimant retains the functional capacity to perform a narrow range of light work activity. She is able to frequently lift and carry 10 pounds, and frequently carry 20 pounds. In a typical 8 hour work day, she is able to stand and walk for a total of 6 hours, sit for a total of 6 hours, but needs to change position from seated to standing every hour. She is able to occasionally push/pull, climb ladders, stoop, kneel and crouch. She is restricted from performing activities requiring overhead reaching, however she is able to perform fine and gross manipulations.

7. The under signed finds that the claimant has non-exertional, emotional limitations, which further erodes her occupational base, however not to a disabling degree. She retains the ability to perform jobs requiring simple 1-2 step instructions, and she is able to interact with the public, coworkers and supervisors on a limited basis.

8. The claimant retains the residual functional capacity to perform her past relevant work as a perfume packer (20 CFR 416.965).

9. Giving all benefit of doubt to the claimant, even [if] we were to assume that she is unable to perform her past relevant work, the undersigned finds that she still retains the residual functional capacity to perform the requirements fo a full, wide and significant range of sedentary work activity, which exists in significant numbers in the national economy.

10. The claimant has not been under a "disability" as defined in the Social Security Act at any time through the date of the decision (20 CFR 416.920(f)).
AR 23-24.

The ALJ's decision became the final decision of the Commissioner when Plaintiff's petition for review to the Appeals Council was denied. AR 3.

15

**D.**     **Plaintiff's Claims on Appeal**

On appeal, Plaintiff contends that (1) the ALJ failed to properly weigh all the medical evidence of record, (2) the ALJ failed to give the appropriate probative value to the treating physician reports of Dr. Sholevar and Dr. Rosillo, and (3) the ALJ failed to properly determine Plaintiff's residual functional capacity.  Pl.'s Br. at 12-25.

**1.     The ALJ Failed to Consider All of the Medical Evidence of Record in Reaching the Determination that Plaintiff is Not Disabled**

Plaintiff argues that the ALJ selectively reviewed and incorporated medical records in reaching its decision.  Pl.'s Br. at 12-13.  Plaintiff further contends that the ALJ's selective review of medical evidence amounted to a failure of the  Commissioner to satisfy her burden to weigh all medical evidence.  Id. at 12.  Specifically, Plaintiff asserts that the ALJ's failure to incorporate into his decision specific details of each of Plaintiff's visits to New Hopes; omission of portions of Dr. Lee's and Dr. Sholevar's reports; and failure to incorporate any discussion of the Psychiatric Review Technique ("PRT"), performed on May 1, 1999 and affirmed on September 10, 1999, amounted to an inaccurate assessment of Plaintiff's psychiatric condition. Id. at 13-14.  Plaintiff also contends that the ALJ's decision ignores evidence of Plaintiff's physical condition.  Id. at 14.  Specifically, Plaintiff argues that the ALJ ignored objective evidence located in the AR, did not fully report the findings of Dr. Wassef, insufficiently reported the findings of Dr. Reiner, and selectively reported findings from the MRI performed on July 11, 2000.  Id. at 14-15.

An ALJ has a duty to review all of the medical evidence before him and provide some

indication of the rejected evidence.  Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).  The ALJ

is free to accept and reject certain medical evidence as long as he provides an explanation for his

rejection of evidence that is inconsistent with his opinion.  Adorno v. Shalala, 40 F.3d 43, 48 (3d

Cir. 1994) ("The Secretary may properly accept some parts of the medical evidence and reject

other parts, but she must consider all the evidence and give some reason for discounting the

evidence she rejects.").  However, the ALJ is not obligated to provide a detailed description of all

treatment notes from all of Plaintiff's medical records.  Fargnoli v. Massanari, 247 F.3d 34, 42

(3d Cir. 2001).   In addition, the ALJ has an obligation to indicate his acceptance or rejection of

such evidence so it is clear to the reviewing court that the evidence was considered and not

merely ignored.  Cotter, 642 F.2d at 705.

An ALJ is required to fully develop the record by incorporating evidence into his opinion

so the basis for his decision is clear.  Fargnoli, 247 F.3d at 41 (citing Cotter, 642 F.2d at 704).  In

his evaluation of the evidence, the ALJ adequately addressed Plaintiff's psychiatric treatment

records from New Hopes, Dr. Lee, and Dr. Sholevar because he provided sufficient detail to

make clear the basis for his decision.  See Fargnoli, 247 F.3d at 41.  Plaintiff argues that the ALJ

did not comprehensively cite the New Hopes records (referred to by Plaintiff as Exhibit 3F) in his

opinion.  Pl.'s Br. at 12.  However, in his discussion of the New Hopes records, the ALJ

mentioned Plaintiff's subjective complaints and the objective findings from several of Plaintiff's

visits.  AR 17-18.  The ALJ reported Plaintiff's complaints of poor sleep, irritability, poor

concentration, insomnia, decreased energy, decreased appetite, recurrent sad moods with crying

spells, forgetfulness, feelings of worthlessness, hopelessness, and helplessness.  Id.  The New

Hopes treatment records further support the proposition that the evidence selected and articulated

17

in the ALJ's report is consistent with the overall treatment records.  AR 137-47.  These records indicate a progressive improvement in Plaintiff's condition over time.  Id.  Although she was initially diagnosed as having major depression with psychotic features, Dr. Rosillo reported on April 28, 1999, her final visit, that Plaintiff was "much happier," and "much less depressed."  Id. at 147.

In addition, Plaintiff argues that the ALJ omitted from his decision Dr. Lee's diagnosis of depression and finding that Plaintiff's interpersonal relationships were limited.  However, the ALJ expressly stated that "the examination failed to reveal any gross or particular signs of depression, even though the claimant appeared to be moderately depressed."  Id. at 19.  Furthermore, although the ALJ did not mention Plaintiff's limitations as to interpersonal relationships, the failure to include such a finding did not amount to a selective review of Dr. Lee's records because the ALJ is not required to include every medical finding.  See Fargnoli, 247 F.3d at 41, 42. Moreover, the ALJ's discussion of Dr. Lee's records is comprehensive enough to indicate that this evidence was considered.  See id.

Plaintiff also argues that the ALJ selectively incorporated Dr. Sholevar's findings because he did not report Plaintiff's GAF score.  Plaintiff's GAF score of fifty-five indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM IV, 34.  A score of fifty-five is consistent with the ALJ's discussion of Dr. Sholevar's treatment records.  In his discussion of Dr. Sholevar's records, the ALJ stated that Plaintiff "retained poor abilities to deal with work stresses; function independently; perform detailed or complex job instructions; or behave in an emotionally stable way."  Id.  While the ALJ did not mention Plaintiff's GAF score in his report, his discussion of Dr. Sholevar's records was comprehensive enough to show that

18

this evidence was also given appropriate consideration.  See Fargnoli, 247 F.3d at 41, 42.

Plaintiff also alleges that the ALJ failed to mention the Psychiatric Review Technique ("PRT") that was performed on May 1, 1999 and affirmed on September 10, 1999.  Plaintiff's PRT revealed that she suffered from a depressive syndrome which amounted to a moderate restriction of her daily living activities, slight difficulties in maintaining social function, and often a failure to complete tasks in a timely manner.  AR 155, 159.

The ALJ is required to consider all significant probative evidence in reaching his decision.  Cotter, 642 F.2d at 705.  If an ALJ fails to mention significant probative evidence in his opinion, the Court is unable to determine whether such evidence was considered and rejected or simply ignored.  Id.  The PRT is significant and probative because, like the RFC assessment, it is an assessment of mental capacity.  See Williams v. Apfel, 98 F. Supp.2d 625, 632 (E.D.Pa. 2000).  However, the ALJ did not explicitly mention Plaintiff's PRT in his opinion.  Therefore, it is unclear whether the ALJ considered all significant probative evidence in reaching his decision. See Cotter, 642 F.2d at 705.

The Commissioner argues, that "it is clear that the ALJ's findings regarding Plaintiff's mental capacity were based in part on [the PRT]."  Def.'s Br. at 10.  However, the findings regarding Plaintiff's mental capacity correspond more directly with other reports contained within the Administrative Record.  The ALJ's finding that Plaintiff retains the ability to perform jobs requiring simple 1-2 step instructions is seemingly based upon Dr. Lee's April 17, 2001 narrative report which stated that "[Plaintiff] is able to follow simple directions,"  AR 269, and Plaintiff's May 1, 1999 FCA, which indicated that Plaintiff's ability to understand, remember, and carry out "very short and simple instructions" was not significantly limited.  Id. at 148.

19

Unlike Dr. Lee's narrative report and the FCA, the PRT does not expressly address Plaintiff's ability to follow instructions.  Id. at 152-60.  Moreover, although Plaintiff's PRT indicated slight "difficulties in maintaining social functioning," the FCA specifically addressed Plaintiff's ability to interact with the public, supervisors, and coworkers.  Id. at 159.  Furthermore, Plaintiff's FCA noted that she had a moderate limitation in her "ability to interact appropriately with the general public."  Id. at 149.  These assessments relate directly to the ALJ's finding that Plaintiff retains the ability to "interact with the public, coworkers and supervisors on a limited basis."  Id. at 23.  Finally, the PRT notes that Plaintiff often fails to complete tasks in a timely manner as a result of her limitations.  Id. at 159.  That assessment appears nowhere in the ALJ's opinion, yet would appear highly relevant to Plaintiff's ability to perform work.  Therefore, since this Court is unable to determine whether the ALJ considered Plaintiff's PRT in reaching his findings, the case must be remanded so that the ALJ can explicitly incorporate the PRT into his determination of Plaintiff's disabled status.

Plaintiff further argues that the ALJ ignored objective evidence of her physical condition by not fully reporting the results of her July 11, 2000 MRI and the findings of Drs. Wassef and Reiner.  Pl.'s Br. at 14-15.  The ALJ's treatment of the medical evidence regarding Plaintiff's physical condition was adequate because the reported findings made clear the basis for his decision.  See Fargnioli, 247 F.3d at 41 (citing Cotter, 642 F.2d at 704).  The ALJ included those findings from Drs. Wassef and Reiner and the July 11, 2000 MRI which demonstrated that his conclusion was supported by substantial evidence.  Dr. Reiner observed restriction of lumbosacral motion and his impression of Plaintiff was that she had a herniated lumbar disc with sciatica.  AR 263.  However, the MRI conducted on July 11, 2000 refuted the finding of the

herniated lumbar disc.  Id. at 262.  Therefore, it appears that the ALJ's decision regarding the credibility of information provided in Dr. Reiner's report was based upon objective medical evidence obtained from Plaintiff's MRI.  Plaintiff also contends that the ALJ selectively reported findings from Dr. Wassef's evaluation.  However, the ALJ's discussion of Dr. Wassef's records mentioned Plaintiff's subjective complaints and Dr. Wassef's objective findings.  The ALJ indicated that Plaintiff complained of "lower back pain, difficulty sleeping, headaches, right shoulder pain, and numbness and tingling in her legs."  AR 17.  The ALJ also included Dr. Wassef's objective findings that Plaintiff's "range of motion in the cervical and lumbar spine were [sic] restricted and some tenderness was noted," but that Plaintiff's gait was normal and her "upper and lower motor strength was 5/5 bilaterally."  Id.  Failure by the ALJ to include in his opinion every one of Dr. Wassef's findings was not error.  See Fargnoli, 247 F.3d at 41.  The ALJ's discussion of these records in his decision indicates that he fully considered the medical evidence from Dr. Wassef in reaching his decision that Plaintiff is not disabled.

## 2. The ALJ Accorded Proper Weight to the Treating and Examining Physicians' Reports

Plaintiff contends that the ALJ substituted his own judgment in place of doctors' opinions and failed to give the reports of Dr. Sholevar, Plaintiff's treating physician, significant probative value.  Pl.'s Br. at 16-20.  Plaintiff further contends that because the ALJ failed to explain the weight that he accorded to the treating physicians' reports, there is no substantial evidence supporting the conclusion that the Plaintiff is not disabled.  Id. at 20.  Specifically, Plaintiff asserts that the ALJ's rejection of Dr. Sholevar's opinion because it is unsupported is "absurd."

21

Id. at 18. Plaintiff also contends that Dr. Sholevar's assessments are supported by objective examination findings, are consistent with Dr. Lee's findings (which the ALJ also accorded little weight), and should be considered in combination with all of the other psychiatric reports from March 4, 1998 to April 17, 2001. Id. at 17-18. Plaintiff also argues that, when the totality of the psychiatric reports is considered, the reports from New Hopes are consistent with the reports of Drs. Sholevar and Lee, and that "a few documented good days does not amount to an overall improvement." Id. at 18.

A treating physician's report is entitled to great weight, and in some instances will be considered controlling. Plummer, 186 F.3d at 429; 20 C.F.R. § 404.1527(d)(2). If, however, a treating physician's opinion is not deemed controlling, the weight to accord the opinion will depend upon the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion through medical signs and laboratory findings, consistency of the opinion with the record as a whole, specialization of the treating physician, and any other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(2)-(6).

The ALJ asserted that Dr. Sholevar's opinion that Plaintiff is unable to work "is not supported by the preponderance of objective medical evidence and [is] grossly inconsistent with the totality of the record." AR 22. Plaintiff argues that Dr. Sholevar's records are supported by records from New Hopes and Dr. Lee's RFC. Pl.'s Br. at 13. However, the records from New Hopes indicate that, although Plaintiff was initially diagnosed on March 4, 1998 as having "major depression with psychotic features," her condition subsequently improved. AR 17-18. Upon reevaluation in May 1998, Plaintiff reported "that she was feeling better" and "her sleep

22

was improved." Id. at 18.  In September 1998, Plaintiff returned to work despite feeling depressed. Id.  On January 13, 1999, Dr. Rosillo of New Hopes found that Plaintiff was not severely depressed, did not experience hallucinations, and was no longer paranoid. Id.  At this visit, Plaintiff stated that she felt a bit depressed, but was sleeping well. Id.  At Plaintiff's final visit to New Hopes on April 28, 1999 Dr. Rosillo reported that Plaintiff was "much happier," felt "more animated," had "more initiative," was "much less depressed," and was "not as bored any more." Id. at 147.  Therefore, the ALJ was not in error when he accorded "little weight" to Dr. Sholevar's opinions in reaching his determination that Plaintiff is not disabled because these records are contradicted by other psychiatric records that are contained within the record.

Plaintiff also contends that Dr. Lee's assessment of Plaintiff's RFC was consistent with Dr. Sholevar's opinions.  However, the ALJ accorded Dr. Lee's assessment of Plaintiff's RFC little weight because his RFC assessment contradicted his own narrative reports. Id. at 22. While Dr. Lee's RFC of Plaintiff noted significant mental limitation on Plaintiff's functional capacity, which indicated she was precluded from performing all work activity, his narrative reports indicated Plaintiff had no signs of depression despite appearing moderately depressed. Id. at 22, 269.  Thus, having determined that Dr. Lee's assessment is entitled to little weight because it is contradictory, it was reasonable for the ALJ not to rely upon Dr. Lee's report in support of Dr. Sholevar's findings.

In addition, the Administrative Record contains records from Dr. Sholevar from only two dates.[9]  AR 255-60.  While it is necessary for the ALJ to consider Plaintiff's entire psychiatric

---

[9]The records from Dr. Sholevar consist of an examination conducted on July 8, 2000 and a mental assessment form and residual function capacity questionnaire regarding Plaintiff's condition which were completed on August 1, 2000.  AR 255-60.  Plaintiff testified at the August

record in order to accurately evaluate her condition, Plaintiff's suggestion that her psychiatric treatment from March 4, 1998 through April 17, 2001 should be attributed to one provider, when she was seen by at least three different providers at three different locations, is unreasonable.  If Plaintiff's psychiatric treatment is attributed exclusively to Dr. Sholevar, his opinions would be entitled to more weight because the weight accorded to a treating physician's opinions depends in part upon the length of the treatment relationship and frequency of examination as well as the nature and extent of the treatment relationship.  CFR §§ 404.1527(d)(2)-(6).  Although a treating physician's opinions are entitled to great weight and possibly even controlling weight, they should be given this weight in accordance with CFR §§ 404.1527(d)(2)-(6), which does not provide for an aggregation of all specialists' records so they can be attributed to the claimant's treating physician.

## III.    CONCLUSION

For the reasons set forth above, the Court finds that the ALJ failed to consider all evidence of record, i.e., Plaintiff's Psychiatric Review Technique.  Therefore, the case is remanded to the Commissioner to permit consideration of the PRT in the determination of Plaintiff's psychiatric condition.   An appropriate order shall follow.


                                        S/ Freda L. Wolfson
                                        Honorable Freda L. Wolfson
                                        United States District Judge

Dated: November 15 , 2005

_____

28, 2000 hearing before the ALJ that she had been seeing Dr. Sholevar once every one to two months and a therapist once or twice a week for the past three years.  Id. at 255.  The AR does not contain any treatment records from Dr. Sholevar or the therapists for any treatment dates other than those listed.

24